Calling case 15-1691, Hattie Tanner v. Joan Yukins. Oral argument not to exceed 15 minutes per side. Mr. Cushing for the appellant. Good morning, your honors. May it please the court, Matthew Cushing on behalf of the petitioner, Hattie Mae Tanner. I'd like to reserve three minutes for rebuttal. Thank you. Ms. Tanner's petition... The level of her representation in this case from the beginning has certainly gone up, so... And I haven't even opened my mouth yet. Just watch it, though. Yeah, she... She was pro se below in the district court. And so hopefully we've been able to... Joan's day, taking on her case. She was represented very briefly by the Michigan Innocence Project. By briefly, I mean for four years. They were trying to prove her innocence. And I think I'd like to begin with the Jackson claim. She is entitled to have her petition granted for either Jackson or Ake. But I'd like to begin with the Jackson. Because whether you consider just the state's evidence or all of the substantial exculpatory evidence in the record... The state failed to prove beyond a reasonable doubt that Ms. Tanner killed Ms. Watson. Or that Rob Cady had killed her for the aiding and abetting claim. On the principal claim, I'd like to just begin quickly with three pieces of exculpatory evidence that seem to have disappeared in the record. First, though not my brief, I hope. First, there was DNA found in bloodstains on the victim's chest that did not belong to either the victim or to Ms. Tanner. Second, there was a footprint found right near the body that did not match the shoes of any person there in the morning. Whether it was the bar employees or the police officers. That was down in the basement you're talking about? It was in the basement just a few feet away from the body. Like a blood footprint? It was in dust. And it was right next to like a rug that had been turned and twisted. And there's some mud right next to that rug spot. So it looked like somebody had sort of dropped mud and stepped in the dust. That footprint did not match Ms. Tanner's shoes when they were collected. And third, Ms. Tanner was outweighed. Mr. Cady's, did they check that? The police did a search of his house. I don't believe that they checked his shoes. They may have checked his shoes, but certainly there's nothing in the record about it matching his shoes. As to the third piece of evidence, Ms. Tanner was outweighed by Ms. Watson by 60 pounds. And not only was the state's theory that she overcame a woman 60 pounds heavier than her, but she also killed her and left no trace evidence in the basement. There's no hair, fibers, blood, DNA, mud. There's nothing. There's no fingerprints in the basement. Nothing tied to Ms. Tanner down at the murder scene. And there did seem to be, as I recall, some kind of a struggle down there. It's undisputed there was a lot of struggle down there. There were tables turned over, chairs flipped up, and Ms. Tanner's a small woman. So do I recall there was also some kind of blood on the wall at the foot of the stairs or going up the stairs? Yes, there was a drop of blood that the testimony looked like it had fallen downward. So perhaps as the murderer walked back up the stairs, you know, casting the knife aside that the blood had fallen down, something like that. That's what I wondered. Did they do a DNA sample on that? The state tried to do DNA testing on most of the blood found at the scene, but somehow could only test the things that implicated all these other people and not my client. They weren't able to test that one piece of blood up in the sink for DNA. I believe that all of the blood that was tested for DNA where they were able to get a hit matched the victim's blood, except for that one DNA spot in blood on the shirt of the victim, which matched someone else and not Ms. Tanner. So you focused on the exculpatory evidence. But obviously under Jackson we need to look at what is the evidence that supports guilt. Well, I would start by saying, of course, Jackson says, look at all of the evidence. But even if you just look at the three pieces of evidence that the state focuses on, which are the blood drop in the sink, the knife that looked like a knife Ms. Tanner owned but wasn't, and then testimony from an officer that she had admitted in an uncorroborated statement to being in a police car. I'm sorry, to being in Rob Katie's car on the night of the murder in that parking lot. Just if I may, on the point of that testimony from Walters, he investigates this thing for several years, gets turned down by one prosecutor, and then lo, he turns out to be his own star witness about a conversation in a car of which there's no evidence. But his testimony, there was also another officer, right, in the car?  He does not testify at trial. My question for you is, are we in fact stuck with his testimony sort of, you know, full bore for purposes of Jackson? Unfortunately, under the double-deference ode for AEDPA and not being able to judge credibility, I think you are stuck with Detective Walters' testimony. Certainly, as background understanding of what happened, the fact that it was uncorroborated and he's the star witness. Actually, on two pieces of evidence, he's also the only witness on the knife looking like Ms. Tanner's knife. He suggested, I'd like to focus on that knife because I think that is probably the most important. For either the aiding and abetting claim or the principal claim, the evidence of the knife was that it looked like a knife Ms. Tanner owned. She admitted that it looked like, the modifications that were made to the tip looked like a knife that she owned. But if you read either the May 24, 1995 transcript, before she was ever a suspect, when she was just being interviewed, or look at her trial testimony, it's consistent all the way through that her knife is a folding blade knife and the murder weapon is a fixed blade knife. She says in the interview transcript that it's a folding blade knife that she keeps in her back pocket. You can't keep a seven-inch long fixed blade knife that was used in the murder in your back pocket. And then at trial, she also says, you know, the officer asked me, or I asked the officer, is it a fixed blade knife or a folding blade knife? And as soon as he told me it's a fixed blade knife, which is true that it was a fixed blade knife, I said, oh, that can't be mine. Mine's a folding blade knife. And there's no evidence of anything else beyond those two statements that are made. If you look at the only person who owned a fixed blade knife, it was the victim. She carried a fixed blade knife in her purse. Her purse was found on the back of the bar right open, right near where this fixed blade knife was found, and there was no knife in her purse. So it's likely that it was her own knife. You didn't have the same general blood type that was found in that diluted drop near the knife, did you? So in everything but one very part. So both the victim and Ms. Tanner had Type B blood, and then there's a phosphoglucomutase subtype. There's 2 plus 1 plus and 2 plus 1 minus. The victim was 2 plus 1 minus, and the drop in the blood was 2 plus 1 plus. If we had a blood serum expert, maybe we would know whether the 1 plus 1 minus could be a testing error, whether that could be, and that goes to the 8 claim. But you're correct that the victim's blood did not directly match at least what we know as the test results of that blood drop in the sink. But the state also did not prove that it didn't come from the person who left the DNA in the basement on the victim's chest. As far as the Michigan Court of Appeals decision, if you read that, it says that there was no blood typing done of the blood stain in which that DNA was found. We don't know whether that was B or not. We don't know whether that was B. If it was, there's a little bit of confusion in the record, but I believe the Michigan Court of Appeals says that that was not blood tested, so you don't know whether that DNA matches what's in the sink. But, of course, that would make the most sense based on the state's theory of there's a struggle in the basement, the murderer cuts themselves somehow in murdering Ms. Watson, then goes upstairs and is cleaning things off but leaves one drop of blood. Well, if they cut themselves and bled on Ms. Watson and that DNA does not match Ms. Tanner, then if we were able to get DNA from that blood drop up in the sink, it also wouldn't have matched Ms. Tanner. Unfortunately, there was not at the time in 1995 when DNA testing was very new, there was insufficient DNA found in that blood drop to be able to actually do the testing. Was there any analysis of whether the knife, in fact, was the murder weapon? I mean, you'd think a knife used that way, there's going to be signs of it being used that way. There was, the victim's blood was on the knife when it was found upstairs in the sink. There was no dispute that that fixed blade knife was used in the murder. That was undisputed. I've got a question. So what in the world was the state's theory at trial to explain the fact that there was the blood of another woman on the clothing of the victim? How did they explain that? They never offered an explanation. They very quickly in two lines of testimony noted the exculpatory evidence that there was DNA found on the woman's chest, on the victim's chest, and then never mentioned it again in the rest of the trial. Were they cross-examined about it by the lawyer who didn't get the serologist? He brought it up once, did not very clearly make much of a case about it, though he clearly should have. I think in his closing he may have mentioned that there was DNA found on this victim's chest and isn't that interesting, and I think that's all he said was isn't that interesting. So the state's theory was that Hattie Tanner was maybe an aider and abetter to somebody who went in and killed. Yeah, the state's theory was that she was an aider and abetter to Rob Cady. Yes, so I don't understand why Cady wasn't also charged with this. Yeah, Cady wasn't charged. I think the police's theory and the state's theory always was that Rob Cady is the one who did it. He's certainly the most likely one between the Budweiser being on the floor by the back door. But there's no physical evidence that ties to him. As you noted, the DNA found on the victim's chest was female. The knife, there are no fingerprints from Rob Cady, and Rob Cady has a different blood type entirely. But wasn't there some testimony about another man in the bar, and there may have been a woman with him and so forth? Yes, there was another individual seen at the bar, not only by Rob Cady, so even if you get rid of his testimony as unbelievable, there were also uninterested witnesses who came and testified that they did see a white male with a beard. And if you look at the sketch that Rob Cady had described, that man has a beard. He's a white male with a beard. It was seen leaving the bar at 1.30 with a passenger. I don't think the sex of the passenger was identified. A pickup truck or tire tracks coming from that area? Yeah, so there are tire tracks from the back of the bar, which is the only muddy area. The rest of it is asphalted, and I think that explains the mud down in the basement. There's fresh mud down in the basement next to the body. It sounds like one could make an argument that it was the person in the pickup truck. You would think that would be reasonable doubt, Your Honors. Wasn't Cady's blood on the victim's shirt? Cady's blood was not found on the victim's shirt. Cady was type A. Can you rule that out? Yes, Rob Cady is type A blood, and there was no type A blood found anywhere, unfortunately. But even if Rob Cady had committed the murder, which was the most likely thing for the aiding and abetting theory, the State never showed that Ms. Tanner gave him the knife, even if it was her knife, and there's very little evidence that it really was her knife, and that she did so with a requisite intent. So even if the State had proven that Rob Cady had done it— The getaway driver. I'm sorry? What if she had been the getaway driver? Two things. One, there's no evidence of—well, first of all, under Michigan law, post activities are only good for concealment charge, not for the aiding and abetting, which actually has to happen beforehand. That would be— Well, and if she was the getaway driver and nothing else, then her blood type would not have been found diluted in the sink. Yeah, and I don't think—I think the blood type in the sink could be explained by a number of other things that aren't— Like all those other people that— The seven other people who were around the sink the morning after that contaminated the crime scene after the murder but before the evidence had been collected. There's no basis for Tanner being an aider or abetter of Cady— That's correct. —based on her being at the scene. Yeah, the state's theory was the aiding and abetting was the giving of the knife, and there's no evidence, A, that she gave the knife. Even if it was her knife, Rob Cady was at her house just a few hours beforehand, could have easily stolen the knife. Smoking crack over there. They were together over at her house smoking crack. He could have easily stolen the knife, even to the extent it was her knife. The only testimony was that she had not seen it in three to four weeks, so he could have even stolen it earlier. So we're dealing with this Jackson claim. Yes. I know. I apologize. So what did the Michigan Supreme Court or highest court addressing this say on the Jackson issue? On the Jackson claim, it said for the principal theory that there was enough evidence if you tied the blood drop, even though that implicated millions of other people, with the testimony from the officer out in the parking lot with the knife, if you believed that the knife was hers, even though the testimony was that it wasn't hers, that that was sufficient. But, you know, if you look at this court's decisions in Newman, Nash, Gill, Parker, Judge Moore, you were on a number of those panels. The facts in Newman were far worse than they are here, and yet this court, even under the double deference of AEDPA, found that the state had failed to prove beyond a reasonable doubt the crime had been committed. I see my time is way up. The Michigan Supreme Court discounted the importance of the blood evidence in dealing with the expert claim and then just dealt with sufficiency sort of in a footnote. Yeah, the footnote as to the aiding and abetting, and the aiding and abetting theory has really never been fully advanced either by the state or by the courts. It's always just been, here's a footnote, believe us. As to the principle, if they want to discount the blood evidence, then I think the case is even weaker. There's nothing putting Ms. Tanner inside the bar then. So I'll reserve any remaining time for rebuttal. Thank you. You'll have your time. Thanks. Good morning, Your Honors. Raina Corbachus from the Michigan Attorney General's Office on behalf of Respondent Joan Yukins. As this court is aware, habeas relief is an extraordinary remedy that the district court denied to the petitioner in this case. The state asks this court to affirm that denial for two reasons. First, that the Supreme Court, the U.S. Supreme Court, has never held that a criminal defendant has a constitutional right to the appointment of a non-psychiatric expert at trial. And second, because the petitioner has not met her high burden of showing that there could be no reasonable dispute, that the Michigan Supreme Court's ruling on the sufficiency claim was wrong. Well, let me ask you this. Let's suppose that the Aik or Aki decision is not limited to psychological or psychiatric experts. Isn't it pretty clear that this lawyer could have used a little help with the serology problem? I have two points to that. It's difficult to find that it does extend to non-psychiatric experts. Supreme Court rulings are very narrowly construed. I'm sorry, but I'm asking you a hypothetical question. Yes, but the petitioner in this case was not denied a fundamentally fair trial because trial counsel was denied a serology expert. Trial counsel made the request to the state trial court. The trial court reasonably determined that he didn't sufficiently meet the requirements under Michigan statute to obtain an expert. Trial counsel aptly cross-examined both prosecution witnesses in this case and obtained some pretty big concessions. All the while saying he didn't know what he was talking about. Well, he did say that at trial, but when the witnesses clearly understood what he was talking about and asked his questions, the fact that the attorney made that comment at trial, the transcript reveals that the witnesses understood what he was talking about and he was able to get the points that he wanted across to the jury, namely that there were possibly millions of others that had that blood type and PGM subtype. The problem is we don't know what other points there might be. What about this 2 plus 1 plus, 2 plus 1 minus? Who knows? I mean, do we know to this day whether that would be exculpatory or whether that could be something they got wrong, in which case it might have been the victim's blood rather than the petitioner's blood? Well, at the time of trial, there was no challenge to the testing of any of the serology testing. Because they didn't have a serologist. And to this day, the petitioner hasn't come forward with any expert that would testify more favorably than what the experts on cross-examination testified for the petitioner. It seems like the showing that you've been saying she had to make at the time and during her Michigan proceedings is that she would show that the serologist would be greatly beneficial to her defense. And I guess my question is, she's trying to get a serologist. How can she make that showing without getting a serologist? Well, there was evidence here that trial counsel did talk to somebody, a law professor, and the best he got from that law professor was you might want to consult with somebody. There wasn't any evidence that they could obtain anything beneficial. And the other reason he wanted to explore this issue, and it was merely to consult with and to explore the issue, was he wanted to find out if there was better DNA testing available at the time of trial versus at the time of the offense. And the trial judge made the point that that is something that could be brought out at cross-examination. Well, you know, the thing that bothered me about the transcript, and I don't have it in front of me and I can't find it, but the expert for the state did one of these comparison things testifying the blood in the sink was, I've forgotten which one, it was this, it was this, it was this, and it was this. And Hattie Tanner's blood is this and this and this and this, which her attorney was unable to deconstruct because he didn't know what it all meant. But when you do that this, this, this, and this, and this, this, this, and this to the jury, they think it's something really weighty. I mean, it may be more weighty than DNA as far as they're concerned. And we've got to remember that DNA back then was not as conclusive as people consider it now. So he was just sort of adrift there at the time of the trial. Well, I do disagree that he was adrift. I thought he did a very good job at cross-examining these prosecution witnesses. And the jury didn't misunderstand the value of this testimony. One of the experts on cross-examination said specifically that DNA testimony is drastically different than this type of testing. And the only thing that they could take away from it is that it was consistent with petitioners and that there were millions of others that also had that same blood and PGM. Let me just say that they must have been the fact that they would convict her when there was only non-DNA evidence that even arguably pointed to her and there was DNA evidence on the victim that exonerated her. And you say the jury clearly found whatever, whatever. That is, to me, a really troubling verdict. A really troubling verdict. Well, and the point I'd like to make is that all of this was before the jury. Trial counsel... Yes. Yes. There most certainly was, and I'll go through some of that, to find the petitioner guilty of felony murder. There was evidence that the petitioner in this case admitted that the murder weapon, which was the knife found at the bar, was hers. While she denied that at trial when she took the stand, she had earlier told Detective Walters that the knife looked like hers and then that it was hers. The knife actually... It's her knife. It's her knife. And there was... She also explained why her prints would be on the knife, too. So she identified it specifically, and she explained why her prints would be on it. Were her prints on it? I don't believe. I'm not sure. I don't believe that they were on it, but she told the detective that her prints, this is why her prints would be found on it. She also admitted that she and Katie were on the bar premises on the night of the murder around the time of the murder. After initially indicating that she wasn't there. That's very damaging. Katie placed himself at the bar as well during the time of the murder. There was strong evidence of motive in this case. Both Petitioner and Katie were close friends. They were smoking crack that night, and they needed cash to get more crack. But he got cash from another bar, didn't he? He did. And once they finished smoking the crack that they had bought with that cash, they needed more cash, and there was evidence that he knew Barney's had cash. There was evidence that he knew where the cash was kept and how to get it. Well, what time did he go to the other bar? If you're arguing that he then went back to Barney's. Well, his testimony at trial was inconsistent in certain ways, as was Petitioner's. But the prosecution's theory was that he and Petitioner went to cash a check together initially, came back to her house after buying crack, and then the second time went out together to Barney's to get more cash. Was there somebody from the first bar where they went and got cash that testified or gave a statement to police? There was. And what time did they say that they showed up? I believe that was around midnight, sometime during midnight, and the murder happened after that. Okay. There was testimony that Katie, who was a regular customer of Barney's, whom the victim trusted, knew he could get in even after hours, and there was evidence of a robbery at Barney's. Cash over $1,000 was missing. The state of the crime scene indicated that there had been a robbery and a struggle, and the wounds of the victim, of course, indicated a struggle. What this is to show, how is Tanner liable? How is she guilty? She's guilty of aiding and abetting Katie in Katie committing the murder. Is that the theory of this? I think the evidence is equally strong as to both theories. Well, but Katie couldn't have committed the murder because his DNA wasn't found on the victim. It was somebody else that we can't even identify. So how does that theory hold up? The fact that there wasn't any DNA evidence found doesn't ---- No, but somebody else's DNA evidence was found. And I don't have an explanation for that. And I'm not sure that that was even blood. Doesn't that raise a little doubt in your mind about all this? I am curious about it, but it was all before the jury, and the jury, when considering all of the evidence, and this court has to consider it in the light most favorable to the prosecution, could reasonably determine that ---- Why? I mean, why? I mean, all you have is it's her knife, this drop of diluted blood, Correct. and she's outside of the bar. That's all you have. Well, a jury could ---- I do think we have to take into account stuff that is pretty clearly exculpatory, right? It's not like we just ignore that. It was part of the trial. So how does that establish guilt beyond a reasonable doubt, particularly when Katie had easy access to the knife and millions of people have this blood type? Well, I think if you look at the prosecutor's argument, millions of people had this consistent with this type of blood and PGM subtype, but how many of them admitted that the murder weapon was theirs? How many of them admitted to being on the bar premises on the night of the murder, at the time of the murder? Let me ask you about that admission. The only proof we have of that is the officer who said this. Is his statement in the record contemporaneous with the crime? And if so, why did the first DA decline to prosecute? If a cop came in to me as the district attorney and said, she told me it was her knife, et cetera, et cetera, et cetera, I wouldn't say, well, I'm going to decline to send this to the grand jury. Well, this case was under investigation for a number of years. But the first DA declined to take any action on it. Am I right about that? Correct. A prosecution has broad discretion to determine. Oh, well, we all know that. Some of us have even been prosecutors. But here's my question. Did the police officer who later testified as to what she said tell that prosecutor that she had told him that? Or was that something that came into the record on down the line five years later? I'm not sure exactly when the prosecutor. I assume it would have been revealed to the prosecutor. I know you're assuming it, but did you know that for sure? I don't know when the detective mentioned it, but I assume it would have been in the beginning with all the other evidence that they got together. At this point, I'm not willing to make assumptions. I really need not a gray area, but something that's either black or white. Right. Well, there would be no reason for the detective not to reveal that right away. And if he had, there would be very little reason for a prosecutor not to send the case to the grand jury then. Well, again, broad discretion in the prosecutor. You know, there was investigation going on for the entire time. The DNA wasn't tested necessarily immediately. There were tips coming in from other individuals. Everything was thoroughly investigated in this case. And the fact that the prosecutor did this investigation, I think just goes to show that they wanted to feel comfortable when they eventually did make the decision to prosecute Ms. Tanner in this case. And I think, again, when you look at all of the evidence, and that's what is required when looking at a sufficiency analysis, when all of it is looked at not in a vacuum and not piece by piece, but together and in the light most favorable to the prosecution, that her customized knife was the murder weapon, that she and Katie were on the bar premises on the night of the murder, around the time of the murder, that her blood type and PGM type was consistent with the blood found on the blood drop that was near the sink, which was found near the knife, that her friend Katie and she had a motive, a strong motive to get cash for more crack, and that a significant number of cash was missing from Barney's. What do we do with the blood on the victim's shirt? That's not anyone's blood here. That's a circumstantial case. This is a circumstance. It's part of the record. Well, again, that was before the jury and I don't, I don't, I don't, does that not create doubt? Um, at somebody else was here and it wasn't Katie and it wasn't her and somebody else was here and in an altercation, obviously with the victim, because stuff's moved all over the place and that person's blood is on the victim.  I, I'm not for certain that, that it was blood. I know that they found DNA of an unidentified. Because I think I've read that many times. Yeah. I, I'm not sure about that. And if it wasn't blood, surely the victim. Why doesn't it create reasonable doubt? That's my question. Um, well, it may have created some doubt for the jury, but when they looked at that, plus all of the other evidence, the admission by petitioner, we're here to review what the jury found, not to just determine what the jury found. Right. And so why should that, why shouldn't that have created reasonable doubt for this jury? Well, it's, it's not a thin case. Otherwise. Yeah. I'll, I can see that the evidence isn't overwhelming, but as a district court said, it was strong and it was sufficient to convict, to convict the petitioner. In this case, when you, when, when looked at all together in the light, most favorable to the prosecution and the prosecution, prosecution under Jackson, isn't obligated to, um, prove, or just prove every hypothesis except that of guilt. They just need to establish, guilt. Um, you know, Ms. Corbacus, I have been listening to, um, I've been sitting on criminal appeals for over 42 years now. Uh, and for 15 of those years, I heard nothing but criminal appeals. And I want to tell you the, the distinct possibility that this woman is innocent is the kind of thing that makes trial judges, but even particularly appellate judges, lose sleep at night. The very thought that this could happen. And I, I would just say, however this case comes out, uh, that maybe the state of Michigan should consider what to do about this case. Um, just consider, for example, that this may not be the murderer that has been in the state prison for 22 years, and that some sort of review and reconsideration ought to take place. Um, I just, that's gratuitous. You didn't ask for that advice. Um, it's not an advisory opinion of any sort, but it may be that it's time, uh, for somebody other than the Innocence Project and a volunteer, a very able volunteer from Jones Day to reconsider this case. Well, if I can briefly just say that petitioner was represented by very able counsel at trial who brought out all of these questions and concerns with the prosecution's case very aptly. They were very clear. And I asked the court to look at the transcript and to see that all of this was before the jury. And my one other final point is that, you know, insufficiency claims, um, they face a high bar. Petitioners face a very high bar on habeas because there's two layers of deference. First to the trier of fact being the jury. We're truly aware of that. Okay. And then also to this. Very narrow question. Sure. It seems like on the Aki or however you say it. Yes. That the, I mean, she did present a federal claim as I understand it. And it seems like the Michigan Supreme Court at least did not apply anything, did simply did not apply the federal standard. It applied a state nexus test. Yes. My question is why is that entitled? Why does that trigger 2254B deference if they didn't even apply the US Supreme Court standard? Well, she did present the claim and, and there's a presumption that the state court addressed the claim and the Supreme Court, I mean, they weren't required the trial court in this case to apply ache because it, it doesn't extend to. I mean, weren't they required to apply some federal standard, like, you know, Griffin or, you know, the, the cases from which ache or Aki, whatever came, they just apply a state law standard. And I think pretty expressly, I think that was, why are we deferring to that as a determination of federal constitutional rights? Well, I think it was absolutely proper for them to turn to state law absence Supreme Court precedent. And, but did they say that Aki didn't apply? I don't believe they mentioned, they mentioned their state tax. Right, right, right. Well, and this court is the district court found could look to that to see if the petitioner was denied a fundamentally fair trial. And even if, if ache applied, I don't, the district court laid it out. She wasn't denied her right to present a defense or a fundamentally fair trial in this case. And this court is required to defer to state court decisions on habeas and should, should do so here with respect to both issues. If, if a prisoner requests the application of a us Supreme Court case, such as Aki and the state Supreme Court says, we deny your claim because of state law. What should the federal court of appeals or district court do? In a habeas situation? Well, there is a presumption that, um, so you're saying that regardless of the explicitness of the state court's decision, relying on state law, we should nonetheless presume contrary wise. Yes. And that is Johnson v. Williams. Johnson. Yes. Okay. We'll look that up. Thank you, your honor. Thank you. Thank you. Any thoughts on that question? Uh, you know, you had complimented me on my preparation and I can't take those compliments. If I missed that issue myself. Um, I think you'd say that the decision of the state court wasn't on the merits of that issue. You can't just talk about a pure state test, which is entirely different from the constitutional test as to the eight claim itself. Um, I would say, I know I didn't address it on my opening, but, uh, the general principle at least is clearly established about the basic tools. As your honor noted, um, ache was an application of that. And here you just have a different application. The expert was just as important. It's not an extension of ache, so it's not a white V. What I'll issue. It's just an application as the Supreme court recognized in an extension because I mean, you know, ache was a psychiatric expert. So ache, uh, on its specific holdings was a psychiatric expert, but you can apply these general principles to different fact patterns without violating Edpa. I recognize your honor's view on what case would you use to say that? Uh, why? Oh, well, so you have Pineda V. Quarterman recognizes the general principles can be applied to new fact patterns without violating Edpa if they're sufficiently analogous. And if you were to really focus on this argument, you could say, um, ache focused on a legal issue for which you had to have an expert in order to be able to put on any kind of a defense. It was insanity there here. It's blood serum where the sole piece of physical evidence that the state is using is that blood drop. But I wanted to answer a couple of this court's questions with citations to the record on the Jackson issue. Just very briefly for the blood, for the DNA, it was found in blood according to Michigan Supreme Court footnote two and also records 16 dash three page four 26. Wait a minute. Um, the footnote two, I can read it to your honors footnote two of the Michigan Supreme Court's decision says testing of the blood stains on the victim's shirt revealed that the blood did not match the DNA profile of either the victim or the defendant. These blood stains, which originated from only one person, were attributable to an unknown female. So that's the DNA being in those blood stains. And that's also in the record. If you want a record specific citation, that's 16 dash three page four 26. To go very briefly back to the ache or achy issue, one way in which the expert would have helped on the reasonably necessary prong is that blood type type B and this PGM subtype, those are only two of 240 different enzymes or markers that you can look at. So all that expert would have had to say to counsel who knew very little to nothing about this is get it retested for any one of these 10 other 20 other things. If a single one of them doesn't match, then you've just proven that it's not Miss Tanner's blood. And then the state, whether in its closing argument where it admits that the only way it puts her in this in the bar loses that piece of evidence or the trial judge himself seemed to recognize that the only reason he wasn't granting a directed verdict was because of that piece of blood evidence. So was that kind of 200 various item testing available at the time that the expert was requested? Or is that what is available now? The difficulty of looking at this backwards is first of all, this information is very difficult to find. I don't know how many of those 240. My source was a recent source and I apologize. It's outside of the record. I apologize for that. I don't know how many of them, but certainly far more than just two blood type and PGM subtype were available before 1995. I think that test actually was done in 1998, the blood typing. As the knife, her prints were not found on the knife. If you look at record 17-2 page 500, the detective admitted to lying that her prints had been found on the knife in order to get her to say and explain why her prints might have been found on the knife, which the detective lied to her. Yes, that's correct. That's correct. The detective admitted to lying to her in the interview in which she said that her prints might be found on the knife because he said, your prints were found on the knife. Why would that be? And she said, well, I last handled it three to four weeks. If that is my knife, there's a lot of confusion that is generated by the fact that this knife looks like a folding knife, but is in fact a fixed blade knife. I apologize. I only learned about this myself by going outside of the record. If you look at the Battle Creek Inquirer, their local newspaper, on June 3, 1995, before they've arrested anyone, as they're investigating this, there's a picture of Detective Walters, this same detective, holding the fixed blade knife up to the camera and explaining in the column that it looks like a folding blade knife, but it's not. It's a fixed blade knife. It could be easily confused for one, and I think that perhaps explains why Ms. Tanner herself thought that it might have been a fixed blade knife that she owned, but it wasn't. Two other points. Hers was a folding knife, right? Hers was a folding knife. That's correct. On your Jackson v. Virginia, if you had to pick your best case to be analogous, where either this court or the Supreme Court has said that the evidence is not sufficient under Jackson, what case would you point to? Newman would be the most as to the principle theory, Brown as to the aiding and abetting theory. Brown v. Palmer for the aiding and abetting theory, Newman v. Metrish, I believe it was. Both are cited in the briefs. The one way in which Newman may be distinguishable is that Newman wasn't there at the crime scene, though far more evidence actually tied Newman. A gun was registered to him. He robbed a drug dealer. He had told people that he wanted to rob a drug dealer. A ski mask was found with his hair and his dog's hair. I mean, there are six or seven different things that all tie to him,  whereas here maybe you have the officer's testimony. So if you look at instead Parker, sort of combining Parker v. Renico plus Newman, I think you could get there. In Parker it was talking about constructive possession of a weapon. The individual was in the backseat of a car with two weapons, two people in the backseat, and the question was, one of the weapons is attributable to one person. Is that second weapon attributable constructively possessed by the other person? And there was a number. So that takes care of the proximity problem. It's a different context because no states really bring cases with this little evidence. So it's very hard to get something directly on point. The most on point, I think, would be Newman. Thank you. Thank you very much. Any further questions? Thank you very much. We appreciate, in particular, the appointment under the Criminal Justice Act for your representation of your client in the interest of justice. And this case will be submitted. Would the clerk adjourn court?